1  Elan S. Mizrahi (NV Bar No. 7450)
   E-mail:  esm@jhc-law.com
2  **JENNINGS, HAUG & CUNNINGHAM, LLP**
   2800 N. Central Ave., Suite 1800
3  Phoenix, Arizona 85004-1049
   602-234-7800
4

5  David J. Rivers (NV Bar No. 384)
   **LEAVITT, SULLY & RIVERS**
6  601 E. Bridger Avenue
   Las Vegas, Nevada 89101
7  702-382-5111

8  Attorneys for Plaintiff

9

10              **UNITED STATES DISTRICT COURT**

11                    **DISTRICT OF NEVADA**

12

13  TRAVELERS CASUALTY AND SURETY          Case No.: 2:12-cv-00058-KJD -RJJ
    COMPANY OF AMERICA, a Connecticut
    corporation,
14                                          DECLARATION OF GERALD M.
                          Plaintiff,        ORMISTON IN SUPPORT OF MOTION
15                                          FOR PRELIMINARY INJUNCTION
    vs.
16
    WILLIAMS BROTHER, INC., an Nevada
17  corporation; PEEK CONSTRUCTION
    COMPANY, a Nevada corporation;
18  MICHAEL WILLIAMS, an individual;
    JOSIE WILLIAMS, an individual; ASHLEY
19  WILLIAMS, an individual; MARIA
    WILLIAMS, an individual; MARK
20  GUBLER, an individual; DAWNA
    GUBLER, an individual; DARIN GUBLER,
21  an individual; and KAREN GUBLER, an
    individual; BRENDA COMPTON PEEK, an
22  individual; MICHAEL L. PEEK, an
    individual; ECCL HOLDINGS, LLC, a
23  Nevada limited liability company;; BLC
    NEVADA TRUST DATED APRIL 20, 2006,
24  a Nevada Trust;

25                          Defendants.

26          I, Gerald M. Ormiston, declare and state:

27          1.   I am a Senior Bond Claim Counsel for Travelers Casualty and Surety Company of

28  America ("Travelers"), responsible for the handling of claims arising out of surety bonds

                         **EXHIBIT "A"**

1   issued by Travelers on behalf of Williams Brother, Inc. ("WBI") and Peek Construction

2   Company ("PCC").  In that position, I have personal knowledge of the facts stated herein.

3        2.   I am responsible for the resolution of claims and lawsuits asserted against the

4   bonds issued by Travelers on behalf of WBI and PCC and for enforcing the terms of two

5   General Agreements of Indemnity ("GAIs"), both of which are the subject of the captioned

6   action.

7        3.   Because a surety is, in effect, a guarantor, sureties, Travelers included, require the

8   construction company to be bonded, and often its owners, principals and related

9   companies, agree to exonerate, indemnify and collateralize the surety against loss by

10  signing what is known as a General Agreement of Indemnity ("GAI").  As a condition to

11  Travelers issuing bonds on behalf of WBI and PCC, both entities were required to execute a

12  GAI, copies of which were attached to the complaint in this matter as Exhibits "A" and "B."

13  PCC's obligations under its GAI were accepted by Rider attached to a prior GAI executed

14  by the predecessor to PCC. (See Exhibit B).

15       4.   Under the terms of the GAIs, WBI and PCC agreed to "exonerate, indemnify and

16  save [Travelers] harmless from and against all Loss" including that incurred related to

17  bonds issued for or on behalf of WBI and PCC and their "respective present or future direct

18  or indirect parent companies, subsidiaries and affiliates and all of their respective

19  successors and assigns" as well as "any present or future joint venture, co-venture,

20  consortium, partnership, trust, association, limited liability company or other legal entity in

21  which one or more of the persons or entities identified [above] have an interest." (GAI, ¶ 3)

22  WBI and PCC further agreed that any "evidence of payment shall be prima facie evidence

23  of the propriety, amount and existence of Indemnitors' liability." (*Id.*)

24       5.   Under the terms of the GAIs, WBI and PCC also agreed that any of the following,

25  among other items, would be a Default under the respective GAI: (1) a declaration of

26  contract default by any Obligee; (2) breach or abandonment of any contract; (3) a breach of

27  any provision of the GAI; (4) failure to make payment of a properly due and owing bill in

28  connection with any contract; and (5) Traveler's establishment of a reserve. (GAI, ¶ 1)

6.  In addition to the express indemnification obligation, WBI and PCC agreed "to deposit with [Travelers] upon demand, an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss." (GAI, ¶ 5)

7.  Under the terms of the GAIs, WBI and PCC also granted Travelers a security interest as security for indemnitors' obligations under the GIA in "the following properties, assets and rights of Indemnitors, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof:

> goods including inventory, equipment and any accessions thereto, Instruments including promissory notes, documents, accounts, chattel paper, deposit accounts, letter of credit rights, securities and other investment property, supporting obligations, any Contract or contract rights or rights to the payment of money, insurance claims and proceeds, and all General Intangibles

(the "Collateral") and further agreed that Travelers could file the GAIs as part of a UCC-1.

8.  On or about September 26, 2011, Travelers, pursuant to its rights under the GAIs, filed with the Nevada Secretary of State at Document No. 2011025306-2, a UCC-1 financing statement to which was attached the WBI GAI, and at Document No. 2011025305-0, a UCC-1 financing statement to which was attached the PCC GAI, by which filing Travelers perfected its interests in the Collateral.

9.  Finally, and most pertinent to Travelers' immediate needs, WBI and PCC agreed to "furnish upon demand . . . the records of Indemnitors including, but nor limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information . . . ." (GAI, ¶ 10)

10. The promises made to Travelers by WBI and PCC under the GAIs are critical in instances such as present themselves here as they provide Travelers with assurances that WBI and PCC will take actions to mitigate or alleviate Traveler's current and future losses.  The promises under the GAI, specifically with respect to the requirement that WBI and PCC produce all requisite books and records, project documentation, bank statements and canceled checks, etc., are also critical because they allow Travelers to determine the financial health of WBI and PCC and to take steps to protect itself based upon their condition.

11. In reliance on the GAIs signed by WBI and PCC, including the individual indemnitors, Travelers issued payment and performance bonds on behalf of WBI in the current collective amount of $29,554,375 (the "WBI Bonds") and payment and performance bonds on behalf of PCC in the current collective amount of $40,923,828 (the "PCC Bonds"). Lists of the current outstanding WBI Bonds and PCC Bonds (collectively, the "Bonds") were attached to the complaint in this matter as Exhibits "C" and "D," respectively.

The Onslaught of Payment Bond Claims and Lawsuits

12. In 2011, Travelers began receiving claims against the Bonds by unpaid subcontractors and suppliers to both WBI and PCC.  A number of lawsuits were filed against Travelers and the Bonds.  Attached as Exhibit "1" is a copy of correspondence from an attorney for one of the many plaintiffs that have filed suit against Travelers on the Bonds, in which the attorney details the failures of WBI and PCC on numerous bonded projects to pay the plaintiff-claimant.

13. As Travelers attempted to work through the claims and lawsuits, the owners of WBI and PCC became increasingly belligerent, refused to indemnify Travelers, failed to post collateral, and, pertinent to this motion, have failed to provide access to their books and records.

14. Travelers has already paid bond claims and incurred costs, expenses, and attorneys' fees, in the current amounts of $2,529,574.07 as to WBI Bonds and $2,317,308.41 as to PCC Bonds.  Travelers anticipates that it will be forced to investigate and adjust additional claims and to defend itself in additional lawsuits.

15. Travelers believes that additional claims will be asserted against the Bonds that Travelers will be forced to pay and that it will continue to incur costs, expenses, and attorney fees.  At this time, Travelers' ultimate loss is not liquidated and it is unknown how much the Loss will amount to.  Travelers has set initial reserves of $3,098,505 for WBI, additional reserves of $5,872,172 for PCC, and additional reserves of $50,000 for El Camino Construction to cover its initial projected Loss related to bonds issued for these entities.

///

16. Without immediate access to WBI's and PCC's books and records, Travelers is unable adequately to adjust additional claims or defend itself in the numerous lawsuits against its Bonds.  Without immediate access to the project records, statements of account for each project, canceled checks and bank statements, Travelers cannot determine what claimants have been paid and, if so, how much.

The Status of On-Going Projects

17. In my role as Senior Bond Claim Counsel, I am especially concerned with the performance and lack thereof, by WBI and PCC on the on-going public projects.

18. On the project generally referred to as "Flamingo Boulder Hwy N," a public project for Clark County, the project is behind schedule.  According to Pay Application  #8 ending December 15, 2012, WBI has consumed approximately 66% of the contract time but has completed only 37% of the work.  There is a significant issue with a major component on the project in that there is a potentially unmaintained sewage bypass line which is running 24/7, and water appears to be filling in the excavated area of the project.  Attached as Exhibits "2" and "3" are copies of a report by the construction manager on the Flamingo project and a recent photograph representing the current status of the project.  Additionally, WBI appears to be attempting to substitute other entities as subcontractors to perform PCC's work despite contractual requirements for substituting listed subcontractors as PCC has demobilized from this project.  Finally, Travelers has just received a letter from the owner advising that the projects are weeks behind with no apparent progress.  A copy of that January 22, 2012 correspondence is attached as Exhibit "4."

19. Owner notices of default are imminent.  Other projects appear to be virtually abandoned.  Ultimately, as WBI and PCC shut down operations, any additional delay will result in increased costs and decreased contract balances due to assessment of liquidated damages.  In fact, on the Laughlin Regional Heritage Greenway Trail project for Clark County, I have received notice dated January 19, 2012 that PCC's contract time has expired and the County will begin assessing $3,500 per day in liquidated damages  Travelers needs immediate access to these project records to assess the current state of the projects and to

1  prepare to take those projects over when the owners declare default.  Without immediate

2  access to WBI's and PCC's project records, Travelers cannot address the current issues on

3  these important public projects to further their completion as will be required, resulting in

4  harm to the public as the projects languish and harm to Travelers as any remaining contract

5  balances are reduced by assessment of liquidated damages.

6  The Rapidly Disappearing Collateral

7  20. Travelers has been informed that WBI and PCC have been placing equipment

8  with auctioneers, which equipment is subject to Travelers' security interest, and obtaining

9  the proceeds thereof in derogation of Travelers' rights under the GAIs and its prior security

10  interests.   PCC has not provided the necessary documentation to allow Travelers to

11  determine its interests and what proceeds, if any, are due Travelers as a result of these

12  sales.

13  21. For example, a prior auction of equipment in which Travelers had an interest was

14  sold and $104,000 was distributed to PCC in derogation of Travelers superior rights

15  because Travelers did not have access to the debt records for that equipment, which records

16  are part of Travelers demand herein.

17  22. Additionally, Travelers has been contacted by an auctioneer regarding a lot of

18  equipment scheduled for sale on January 27, 2012.  Prior UCC interests have been recorded

19  against this equipment, and other pieces of equipment and without immediate access to

20  WBI's and PCC's books and records, including bank statements showing amounts owed to

21  Nevada State Bank, debt records on equipment on which Cashman Equipment has a prior

22  interest, and other such prior or secondary debts, Travelers is unable to determine what its

23  rights are to the proceeds of any such auction.  If the equipment is sold in the ordinary

24  course on January 27 to a good faith buyer in due course, and the proceeds are distributed

25  to WBI and/or PCC, Travelers will be without legal recourse to maintain its rights in that

26  equipment and/or proceeds.  Unless Travelers is provided immediate access to WBI's and

27  PCC's books and records, it cannot determine its rights in that equipment, in other

28  equipment, and in the proceeds of such prior and future sales.

23. Travelers has been informed by the auctioneer that the timing of the January 27 sale is critical and an opportunity to generate significantly more proceeds will be lost if the auction does not take place on January 27.  Unless Travelers is granted immediate access and/or provided the books and records related to this equipment, Travelers will be unable to determine its rights in that equipment and the sale may be jeopardized.

Affirmative Claims

24. Travelers has discovered numerous affirmative claims being pursued by WBI and PCC against various owners on certain projects, including: (1) NDOT Project No. 3407 (Wells); (2) City of Carson City NSWT; NDOT Project 3377 Kingsbury SR207; (3) McCarran Airport Taxiway; (4) Lake Village Phase II Water  for Douglas County; and others.

25. Travelers has the prior rights in these affirmative claims by virtue of the losses incurred on bonds issued by Travelers for these public projects, its common law indemnity rights, and its UCC-related rights as granted under the GAIs.

26. Travelers is informed that WBI and/or PCC have been attempting to settle these claims, and obtain the proceeds thereof in derogation of Travelers' prior rights.

27. Unless Travelers is granted immediate access and/or provided copies of the project records for the projects on which affirmative claims are being asserted, as well as the documentation of the claims themselves, Travelers will be unable to determine the substance of such claims as well as the existence of unknown claims to assert its prior interests, increasing Travelers' potential loss.

28. Additionally, WBI's and PCC's apparent financial situation increases the danger that funds from bonded projects have been and will be diverted to pay other financial obligations of WBI and PCC.  Without immediate access to all the books and records, including deposit statements, wire transfers, and bank statements, Travelers will be unable to determine if such improper diversions have or will take place.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January *24*, 2012 at Federal Way, Washington.

Gerald M. Ormiston

Exhibit "1"



# LEWIS
## AND
# ROCA
LLP
L A W Y E R S

Daniel S. Ivie
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

Direct Dial: (702) 474-2645
Direct Fax: (702) 216-6179
DIvie@LRLaw.com
Admitted in: Nevada and Utah

Our File Number:  39130-00076

October 7, 2011

**Via Hand Delivery and Certified Mail**
Daniel Cereghino
Jones Vargas LLP
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada  89169

       Re:   *Arizona Structure Technologies, Inc. v. Peek Construction and Travelers Casualty*
            *and Surety Company of America*
            Case No. A-11-645103-C

Dear Mr. Cereghino:

       I write to you in your capacity as counsel for Travelers Casualty and Surety Company of America ("Travelers") in the above-referenced matter. The purpose of this correspondence is to urge your client to proceed in good faith and conduct a reasonable investigation of my client Arizona Structure Technologies, Inc.'s ("Arizona Structure") claim against the payment bond supplied by Travelers on the Laughlin Regional Heritage Greenway Trail project (the "Laughlin project") and also to provide a detailed summary of AZ Structure's prior efforts to obtain payment from Peek Construction Company ("Peek"). I believe such an investigation easily establishes the merits of Arizona Structure's claims against the bond.

       Chapter 339 of the Nevada Revised Statutes requires contractors such as Peek to obtain payment bonds to protect subcontractors who supply labor or materials to the contractor on a project for the construction of a public work. *See* NRS 339.025(1)(b). It is under this section that Arizona Structure has made a claim against the payment bond supplied by Travelers in this case.

       As I'm sure you and Travelers are aware, a surety has an obligation to conduct a reasonable investigation of the merits of all claims for payment that are presented to it; failure to do so puts the surety at risk for a bad faith claim. *Pemberton v. Farmers Ins. Exchange*, 109 Nev. 789, 797, 858 P.2d 380, 384 (1993) (bad faith claim lies where insurer unreasonably fails to execute its obligations to the insured); *Noble v. National American Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981) (an action for the tort of bad faith lies where the plaintiff can show that the insurer intentionally or recklessly failed to pay a valid claim); *Dodge v. Fidelity and Deposit Co. of Maryland*, 778 P.2d 1240, 1242 (Ariz. 1989) (holding that sureties have the same duty to act in good faith in investigating claims as other types of insurers). The surety is also obligated, by the very nature of the insurance contract, to pay any meritorious claims against the payment bond.



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

Mr. Daniel Cereghino
October 7, 2011
Page 2

In this case, Travelers has an obligation to investigate Arizona Structure's claim against the payment bond provided by Travelers on the Laughlin project. Beginning long before the instant case was filed, Arizona Structure has made repeated demand for payment from Peek. Peek has often promised payment—Peek and Arizona Structure have even held in-person meetings and agreed to payment schedules—yet Peek has consistently failed to keep its promises to pay. The following is a more detailed summary of Arizona Structure's repeated efforts to secure payment from Peek.

| DATE | DESCRIPTION/EVENT |
|------|-------------------|
| 4/5/2011 | Brad Booth of Arizona Structure and Bill Gettman of Peek spoke on the telephone about the status of several past due invoices and amounts owed to Arizona Structure. Mr. Gettman told Mr. Booth to call him the following day if Mr. Booth still had not received a check from Peek for the past due invoices. |
| 4/6/2011 | Mr. Booth telephoned Mr. Gettman and informed him Arizona Structure had still not received any check or other form of payment from Peek for the past due invoices. Mr. Gettman stated that a check had been mailed on March 29, 2011, but that it was returned to Peek on April 6, 2011 due to an incorrect address. Mr. Booth requested that the check be overnighted at Arizona Structure's expense. |
| 4/7/2011 | Arizona Structure receives the overnighted check in the amount of $97,145.40 via Fed-Ex. |
| 4/12/2011 | Mr. Booth emailed Mr. Gettman regarding invoice # 1210 dated February 24, 2011 in the amount of $86,734.60 for work done on the Sandhill-Owens project. Mr. Gettman responded by email that he would provide Mr. Booth with "a payment schedule, hopefully by tomorrow. I will keep you posted." No payment schedule was sent, however. |
| 4/18/2011 | Mr. Booth again emailed Mr. Gettman requesting the payment status of four separate past due invoices:<br><br>Invoice # 1210, dated 2/24/2011: $86,734.60 - Sandhill Owens<br>Invoice # 1212, dated 2/24/2011: $133,839.29 - Laughlin Regional<br>Invoice # 1219, dated 3/16/2011: $14,749.88 - Laughlin Regional<br>Invoice # 1220, dated 3/18/2011: $11,100.00 - Sandhill Owens<br><br>Mr. Gettman did not respond to Mr. Booth's email. |



| 4/19/2011 | Mr. Booth again telephoned Mr. Gettman and left a voice message to please return his call. Mr. Gettman did not return the phone call. |
|---|---|
| 4/20/2011 | Arizona Structure's last date worked on the Laughlin project. |
| 4/22/2011 | Mr. Booth left another voice message for Mr. Gettman to return his call. Mr. Gettman did not return the phone call. |
| 4/25/2011 | Mr. Booth called and spoke to Mr. Gettman at Peek's Laughlin Regional Heritage jobsite office. Mr. Gettman stated he would call Mr. Booth the following day when Mr. Gettman returned to Peek's Las Vegas office. Mr. Gettman did not call Mr. Booth. |
| 4/27/2011 | Mr. Booth again left Mr. Gettman a voice message, asking him to return his call. |
| 4/27/2011 | Sergio Barrera, a project manager for Arizona Structure, emailed Mr. Gettman and copied Mr. Booth on the email. Mr. Gettman responded via email and stated that Peek would pay $133,839.29 for invoice # 1212 on 4/29/2011 and $86,734.60 for invoice # 1210 on 5/13/2011. |
| 4/29/2011 | Mr. Booth telephoned Mr. Gettman and left a voice message for him to return the call. Mr. Booth also telephoned Ms. Kristine Deveney with Peek's accounts payable office regarding payment on the past due invoices. Ms. Deveney indicated she would speak with Leslie Jay about the invoices and get back to Mr. Booth. Neither Ms. Deveney or Ms. Jay returned Mr. Booth's phone call. |
| 5/2/2011 | Mr. Booth left a voice message for Ms. Jay to call him regarding invoice #s 1210, 1212, 1219, 1220. |
| 5/4/2011 | Mr. Booth spoke with Ms. Deveney on the telephone. Ms. Deveney stated that Ms. Jay had not received an answer from the Owner regarding payment on the four past due invoices.<br><br>Mr. Booth telephoned Ms. Carol Hart, project manager for Peek on the Laughlin project, and explained to Ms. Hart his difficulties in obtaining a payment status. Ms. Hart stated she would forward Leslie Jay's email address to Mr. Booth, and did so shortly thereafter.<br><br>Mr. Booth emailed Ms. Jay and requested a payment status on the four past due invoices. |



LEWIS
AND
ROCA
—LLP—
L A W Y E R S

| | |
|---|---|
| 5/5/2011 | Ms. Carol Hart emailed Mr. Booth and stated that Peek was reducing Arizona Structure's April, 2011 pay application by 50% and would be scheduling an on-site meeting at the Laughlin project in the near future.<br><br>Mr. Booth left Ms. Hart a voice message that same day regarding the 50% reduction. |
| 5/12/2011 | Mr. Booth made separate phone calls to both Ms. Jay and Mr. Gettman and left voice messages requesting that each return his call and provide an update on the four past due invoices.<br><br>Neither returned Mr. Booth's call. |
| 5/17/2011 | Mr. Booth left Ms. Deveney a voice message asking her to tell Ms. Jay to call him when she arrived in the office that morning. Mr. Booth also stated that he and other Arizona Structure principals would be in Las Vegas on 5/19/2011 and that they would like to make a visit to Peek. |
| 5/19/2011 | Mr. Booth, Mr. Barrera and Mr. Bill Harter visited Peek's Las Vegas office and asked to see Mr. Peek. Ms. Deveney informed them Mr. Peek was out of the office.<br><br>Mr. Booth, Mr. Barrera and Mr. Harter visited Peek's jobsite office at the Laughlin project and met with Mr. Jeff Willson, Ms. Hart and Delores Johnson of Peek in an effort to resolve all outstanding issues and change orders on the project, including all the past due invoices. |
| 5/20/2011 | Mr. Booth received a phone call from Ms. Hart indicating that Peek's Las Vegas office had tried to contact him and others regarding returning to Las Vegas to meet with Mr. Peek.<br><br>Mr. Booth left a voice message with Mr. Peek and asked that he return his call. |
| 5/22/2011 | Ms. Hart emailed Mr. Booth on Sunday and invited him and others to meet with Mr. Peek on 5/24/2011 at 1:00 p.m. in Las Vegas. |
| 5/23/2011 | Mr. Booth accepted by email the invitation to meet with Mr. Peek on 5/24/2011. |
| 5/24/2011 | Mr. Booth and Mr. Harter of Arizona Structure meet with Mr. Peek and Mr. Gettman of Peek from 1:00 p.m. to approximately 1:45 p.m.  Mr. Peek indicated that payment to Arizona Structure would be made as follows:<br><br>Invoice # 1210, dated 2/24/2011: $86,734.60 would be paid on 6/10/2011 |



| | |
|---|---|
| | Invoice # 1212, dated 2/24/2011: $133,839.29 would be paid on 6/17,2011<br>Invoice # 1219, dated 3/16/2011: $14,749.88 would be paid on 7/1/2011<br>Invoice # 1220, dated 3/18/2011: $11,100.00 would be paid on 6/10/2011<br>Invoice # 1234, dated 4/22/2011: $187,879.92 would be paid on 7/1/2011 |
| 6/9/2011 | Mr. Booth left a voice message for Mr. Gettman to call him regarding the payments due on 6/10/2011 and 6/17/2011 and to make arrangements for picking up the checks for those payments.<br><br>Mr. Booth also left a voice message for Ms. Hart to the same effect. Neither returned Mr. Booth's phone calls. |
| 6/10/2011 | Mr. Booth left voice messages for Mr. Gettman at 7:10 a.m., 9:40 a.m., and 10:54 a.m. about the scheduled payments.<br><br>Mr. Booth also called Peek's Laughlin jobsite office and spoke to Ms. Delores Johnson regarding Peek's failure to respond to his numerous messages regarding payment. |
| 6/13/2011 | Mr. Booth left another voice message for Mr. Gettman regarding status of the payments that were promised to have been made on 6/10/2011 and requested that Mr. Gettman contact him by any means. |
| 6/14/2011 | Mr. Gettman finally returned Mr. Booth's numerous messages and requested Arizona Structure's Fed-Ex account number to overnight the promised 6/10/2011 payments.  Mr. Gettman expressed disappointment that the payments had not been made according to the payment schedule agreed to during the 5/24/2011 meeting in Las Vegas. |
| 6/15/2011 | Mr. Booth left Mr. Gettman a voice message requesting the tracking number for overnighted checks. |
| 6/16/2011 | Arizona Structure received check # 20292 from Peek in the amount of $86,734.60 for payment of Invoice # 1210.<br><br>Mr. Booth left Mr. Gettman a voice message inquiring why no check was sent for $11,100.00 for payment of Invoice #1220 as was promised and agreed during the 5/24/2011 meeting in Las Vegas.<br><br>Mr. Gettman did not return Mr. Booth's phone call. |
| 6/17/2011 | Peek failed to make payment on Invoice #1212 in the amount of $133,839.29 as |



| | |
|---|---|
| | agreed to during the 5/24/2011 meeting in Las Vegas. |
| 6/23/2011 | Mr. Booth left voice messages for Mr. Peek, Ms. Hart, Ms. Jay and Ms. Deveney to return his call regarding the missed payments and the status of the upcoming 7/1/2011 scheduled payments.<br><br>None of Mr. Booth's calls were returned. |
| 6/24/2011 | Mr. Booth sent a letter to Peek via Fed-Ex demanding immediate payment of the outstanding sums. |
| 6/28/2011 | Ms. Hart called Mr. Booth and stated that all of Arizona Structure's outstanding invoices on both the Laughlin and Sandhill projects would be paid in full on 7/9/2011.<br><br>Mr. Gettman also called Mr. Booth and promised full payment of all outstanding invoices on 7/9/2011. |
| 6/29/2001 | Ms. Connie Orlando, on behalf of Travelers, sent Mr. Booth a letter requesting further documentation to support a bond claim form presented to Travelers previously. Ms. Orlando's request was made in order to "facilitate our independent investigation of [Arizona Structure's] claim. |
| 7/1/2011 | Mr. Booth sent completed bond claim forms, including all requested documentation, to Travelers care of Ms. Orlando. These forms were requested by Travelers in Ms. Orlando's 6/29/2011 letter to Mr. Booth. |
| 7/8/2011 | Mr. Booth left a voice message for Mr. Gettman to follow up on the promise that all of Arizona Structure's invoices would be paid in full on 7/9/2011.<br><br>Mr. Gettman did not return Mr. Booth's phone call. |
| 7/9/2011 | Peek again failed to fulfill its promises to make full payment on each of Arizona Structure's outstanding invoices. |
| 7/14/2011 | Arizona Structure, through its counsel Lewis and Roca LLP, sent correspondence addressed to Mr. Peek indicating that Arizona Structure was owed the sum of $544,518.00 on the Laughlin project and that Arizona Structure would file a lawsuit against Peek and its surety, Travelers Casualty and Surety Company of America if full payment was not made within five days. |
| 7/18/2011 | Arizona Structure files suit against Peek and Travelers to recover the outstanding |



LEWIS
AND
ROCA
— LLP —
L A W Y E R S

Mr. Daniel Cereghino
October 7, 2011
Page 7

| | |
|---|---|
| | sums owed to Arizona Structure for the Laughlin and Sandhill projects. |
| 7/19/2011 | Peek failed to make any further payment on the outstanding balance for the Laughlin project by the deadline set in the 7/14/2011 demand letter. |

As you can see, Arizona Structure has made repeated efforts to secure payment from Peek for the work it performed on the Laughlin job. Peek has consistently demonstrated that it is either unwilling or unable to make full payment. This situation is a perfect example for which contractors are required to obtain payment bonds pursuant to NRS Chapter 339. That chapter provides as follows:

> 1. Before any contract, except one subject to the provisions of chapter 408 of NRS, exceeding $100,000 for any project for the new construction, repair or reconstruction of any public building or other public work or public improvement of any contracting body is awarded to any contractor, the contractor shall furnish to the contracting body the following bonds which become binding upon the award of the contract to the contractor:
>
> ...
>
> (b) A payment bond in an amount to be fixed by the contracting body, but not less than 50 percent of the contract amount. The bond must be **solely for the protection of claimants supplying labor or materials to the contractor** to whom the contract was awarded, or to any of his or her subcontractors, in the prosecution of the work provided for in such contract.

NRS 339.025(1)(b) (emphasis added).

That same chapter also provides the conditions under which a party who has supplied materials or labor such as Arizona Structure may make a claim against payment bond:

> 1. Subject to the provisions of subsection 2, any claimant who has performed labor or furnished material in the prosecution of the work provided for in any contract for which a payment bond has been given pursuant to the provisions of subsection 1 of NRS 339.025, **and who has not been paid in full before the expiration of 90 days after the date on which the claimant performed the last of such labor or furnished the last of such materials for which the claimant claims payment, may bring an action on such payment bond in his or her own name to recover any amount due the claimant for such labor or material,** and may prosecute such action to final judgment and have execution on the judgment.

NRS 339.035(1) (emphasis added).

289790.1


LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

Mr. Daniel Cereghino
October 7, 2011
Page 8

As you are well aware, due to your capacity as counsel for both Peek and Travelers, Peek has not disputed that it owes the outstanding sums. In fact, Peek has consistently promised to make full payment to Arizona Structure. Even after the commencement of the present lawsuit, Peek has offered to settle the case by paying the full amount, albeit in delayed partial payments spread over several months.

Peek's continued promises to pay the outstanding amounts establish the validity of Arizona Structure's claim against the payment bond. Travelers is obligated, both by case law and, presumably, by contract, to proceed in good faith and conduct a reasonable investigation of these claims and then to settle any meritorious claims. Such an investigation should have been undertaken by Travelers as soon as it was made aware of Arizona Structure's claim. Given the straightforward nature of the facts in this case and Peek's tacit admission that it owes the sums, we can see no reasonable basis for Traveler's refusal to pay the claim before now. Any issues of indemnification for claims paid by Travelers are between Travelers and Peek and should not delay payment to Arizona Structure. Arizona Structure should not be prejudiced by Peek's inability or unwillingness to make full payment. Moreover, due in part to Traveler's failure to pay this valid claim, Arizona Structure has been forced to retain our office and incur attorney's fees and costs of court in order to prosecute this action.

Therefore, on behalf of Arizona Structure, we hereby demand that Travelers pay the entire outstanding balance due and owing to Arizona Structure on the Laughlin project, including interest, attorney's fees and costs, detailed as follows:

| | |
|---|---|
| Principal: | $ 410,678.71 |
| Interest: | $  26,340.00 |
| Attorney's fees: | $  13,554.50 |
| Other fees and costs: | $     446.50 |
| **Total** | **$ 451,019.71** |

If the total balance shown above is not paid within twenty (20) days of the date of this letter, Arizona Structure will evaluate all additional potential claims against Travelers. I look forward to hearing from you regarding this issue.

Best regards,

Daniel S. Ivie

289790.1

Exhibit "2"

| From: | Tony.Colagiovanni@CH2M.com |
|---|---|
| To: | GORMISTO@travelers.com |
| Cc: | Chad_Schexnayder; ISALYER@travelers.com; JIBROOKS@travelers.com |
| Subject: | Re: Flamingo Boulder project |
| Date: | Tuesday, January 17, 2012 5:55:02 PM |

They had a 400 cy concrete pour last Friday. Not much in the week and a half before that and no day work since. Brad, informed me today that they will not work until the bonding company agrees to pay the labor costs.

Sent from my iPhone

On Jan 17, 2012, at 2:50 PM, "Ormiston,Gerald M." <GORMISTO@travelers.com> wrote:

>
> Tony:
>
> Is the Contractor, Williams Brother, Inc., or Peek Construction performing any work on this project?
>
> What is your understanding of the status?
>
> Thank you for your help.
>
> Gerry Ormiston
>
> *Travelers* / **Gerald M. Ormiston** / **33650 6th Avenue South, Suite 200** /
> **Federal Way, WA   98003-6754** / **Ph:  253/943.5818** / **Fx:  888/479.1191** /
>
>
> ======================================================================
>
> This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

Exhibit "3"



Exhibit "4"

# OFFICE OF THE DISTRICT ATTORNEY
## CIVIL DIVISION

**MARY-ANNE MILLER**
*District Attorney*

**CHRIS OWENS**
*Assistant District Attorney*

**TERESA M. LOWRY**
*Assistant District Attorney*

**LAURA C. REHFELDT**
*Chief Deputy District Attorney*

January 22, 2012

**VIA EMAIL & FACSIMILE**

Gerald M. Ormiston
Travelers
33650 6th Avenue South, Suite 200
Federal Way, WA. 98003-6754

Re:   **Williams Brother, Inc. and Peek Construction:  Flamingo-Boulder Highway
and Laughlin Greenway Heritage Trail projects**

Dear Mr. Ormiston:

As we discussed late last week, Clark County has serious performance concerns with two projects involving Williams Brother, Inc. and Peek Construction as contractors:  1) Flamingo - Boulder Highway; and 2) Laughlin Greenway Heritage Trail.

With respect to the Flamingo - Boulder Highway Project, it is my understanding that, over the last 30-45 days, there has been a substantial reduction in work force on the project site and very little progress towards completion.  At this point it appears that the contractor, Williams Brother, Inc., is at least 45 days behind on this project.

As for the Laughlin Greenway Heritage Trail project, the contract required that the project be substantially complete on January 18, 2012.  At this time, the project is not substantially complete and it is estimated that the contractor, Peek Construction, is 45 days behind.  It is my understanding that the contractor on this project, like the Flamingo-Boulder Highway project, has nearly stopped work.

The County, as obligee under the performance bonds the contractors obtained through Travelers, respectfully requests your assistance in ensuring project completion in accordance

500 S Grand Central Pky • PO Box 552215 • Las Vegas NV 89155-2215
(702) 455-4761 • Fax: (702) 382-5178 • TDD: (702) 385-7486

P:\REHFELL\Correspondence\Ormiston Ltr.doc

Gerald M. Ormiston
January 22, 2012
Page 2

with the contracts.   Public Works project construction managers are continuing to assess the performance issues on these jobs.

Thank you for your willingness to meet with me and representatives from the Clark County Department of Public Works on this Thursday, January 26, 2012, at 9:30 a.m. to discuss these projects and the County's concerns.  The meeting will take place in the director's conference room on the 2nd floor of the Clark County Government Center, 500 S. Grand Central Parkway, Las Vegas, Nevada.  We look forward to seeing you then.

Sincerely,

MARY-ANNE MILLER
DISTRICT ATTORNEY

By: _LAURA C. REHFELDT_____
LAURA C. REHFELDT
Chief Deputy District Attorney

LCR:pv

cc: Denis Cederburg, Director, Clark County Department of Public Works,
    Robert Thompson, Assistant Director, Clark County Department of Public Works
    Mike Mamer, Manager, Construction Management Division of Public Works
    Matt Burke, Project Manager of Flamingo-Boulder Highway Project
    Bruce Torrey, Project Manager of Laughlin Trails Project
    James W. Pengilly, Esq., attorney for Peek Construction and Williams Brother, Inc.
    Robert T. Robbins, Esq., attorney for Peek Construction and Williams Brother, Inc.
    Chad L. Schexnayder, Esq., attorney for Travelers