1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

7
8
9

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | 2:12-cv-0058-LDG-NJK |
| Plaintiff, | ORDER |
| v. | |
| WILLIAMS BROTHER, INC., et al., | |
| Defendants. | |

15

16      This action arises out of plaintiff Travelers Casualty and Surety Company of America's

17  ("Travelers") claims against several construction companies and indemnitor entities and

18  individuals related to obligations under various indemnity agreements.  Travelers is a surety

19  company that stands as surety for selected contractors.  Because Nevada law requires that all

20  public works be performed by a construction company that is bonded, the surety that writes these

21  bonds requires the contractors, principals and related companies to exonerate, indemnify and

22  collateralize the surety against loss through general agreements of indemnity.  Such agreements,

23  generally known as GAIs, were executed between Travelers and defendants Williams Brother, Inc.

24  ("Williams Brother"), and Peek Construction Company ("Peek Construction"), in addition to

25  indemnitor individuals and entities ("indemnitor defendants").  Pursuant to the GAIs, Travelers

26  was granted a right to defendants' properties, assets and other rights to payment or proceeds in the

1  event of a default and payment on the bonds.  Travelers asserts that its net payout for bond claims

2  and expenses on bonds issued to Williams Brother and Peek Construction through May 2013

3  exceeds $14.6 million.

4      Williams Brother, Peek Construction and the indemnitor defendants agreed under the GAIs

5  to indemnify Travelers for the entire amount of Travelers' losses on the bonds.  That obligation is

6  joint and several as to all defendants.[1]  On June 17, 2013, Travelers filed an emergency motion for

7  injunctive relief freezing all assets of indemnitor defendants (#225) except for court-approved

8  living expenses pending termination of the litigation.  After a brief hearing on July 10, 2013, the

9  court issued a temporary restraining order on July 11, 2013, and continued the preliminary

10  injunction hearing until July 18, 2013, in order to consider supplemental briefs on whether the

11  state attachment process is the exclusive remedy to preserve assets before judgment.[2]  After the

12  Peek defendants filed their motion to set aside default judgment and dismissal against the Peek

13  corporate defendants on July 16, 2013, the court vacated the scheduled preliminary injunction

14  hearing until after a ruling on the motion to set aside.  On August 26, 2013, the court granted the

15  Peek defendants' motion to set aside and ordered that the hearing on Travelers' motion for

16  injunctive relief freezing all assets be conducted on September 12, 2013.  That hearing has now

17  taken place.

18                                    Preliminary Injunction

19      Travelers seeks a preliminary injunction freezing all assets of Peek Construction Company,

20  and indemnitor defendants Michael and Brenda Peek, ECCL Holdings, LLC, and BLC Nevada

21  Trust Dated April 20, 2006.  As provided by Fed. R. Civ. P. 65, a court may issue a preliminary

22

23      [1]Previously, the court dismissed the corporate defendants' counterclaims, and granted default
    judgment against the corporate defendants for failure to comply with the court's orders to retain
24  counsel.  However, the court subsequently set aside those rulings as to the Peek corporate defendants
    after they retained counsel.  A motion to set aside default judgment is pending as to Williams Brother.

25      [2]The court has reviewed the supplemental briefs and is satisfied that Travelers is not precluded
26  by Nevada law from seeking injunctive relief to preserve assets.

1  injunction to preserve the relative position of the parties pending a trial on the merits.  See

2  University of Texas v. Camenisch, 451 U.S. 390, 395 (1981).  The party seeking injunctive relief

3  must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

4  the absence of preliminary relief, that the balance of equities tips in his favor, and that an

5  injunction is in the public interest."  Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 20

6  (2008).  The Ninth Circuit considers all of the elements except for irreparable injury using a

7  sliding scale approach, where "the elements of the preliminary injunction test are balanced, so that

8  a stronger showing of one element may offset a weaker showing of another."  Alliance for the

9  Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  The element of irreparable injury

10  is not subject to balance; the moving party must "demonstrate that irreparable injury is likely in

11  the absence of an injunction."  Winter, 555 U.S. at 23.  The Supreme Court has repeatedly

12  emphasized that "injunctive relief [i]s an extraordinary remedy that may only be awarded upon a

13  clear showing that the plaintiff is entitled to such relief."  Id. at 22.

14          In applying the federal injunction standard in a diversity case, courts recognize that state

15  law would control on the issue of whether a plaintiff is entitled to seek injunctive relief on the

16  claim.  See Sims Snowboards, Inc., v. Kelly, 863 F.2d 643, 645-46 (9th Cir. 1988).  After

17  concluding that a plaintiff is entitled to seek a preliminary injunction, however, courts in this

18  circuit and others, which this court finds persuasive, have relied on the federal standard in

19  exercising their discretion to determine whether to grant an injunction. See United Nat'l Maint.,

20  Inc. v. San Diego Convention Ctr. Corp., Civ. No. 07cv2172 AJB, 2012 WL 3861946, at *4 (S.D.

21  Cal. 2012) (applying state law to determine whether an injunction is an available remedy on

22  plaintiff's claim, but then applying "federal law principles in determining whether to exercise

23  discretion to grant or deny an injunction that is available under state law"); Travelers Cas. & Sur.

24  Co. of Am. v. W.P. Rowland Constructors Corp., No. CV 12-00390-PHX-FJM, 2012 WL

25  1718630, at *2 (D. Ariz. May 15, 2012); Toschi v. Cnty. of San Mateo, No. C-07-3625 MMC,

26

3

2009 WL 982136, at *12 n. 13 (N.D. Cal. April. 13, 2009); <u>Sullivan By and Through Sullivan v.</u> <u>Vallejo City</u>, 731 F. Supp. 947, 956 (E.D. Cal. 1990) ("[F]ederal law provides the standards governing plaintiff's motion for preliminary injunctive relief with respect to both her federal and state law claims"); <u>Kaiser Trading Co. v. Associated Metals & Minerals Corp.</u>, 321 F. Supp. 923, 931 n. 14 (N.D. Cal. 1970) ("[T]he best approach would be to look to state law to determine if a preliminary injunction is permissible . . . [and then] look to federal law to determine whether the court should exercise its discretion"); <u>see also</u> <u>Certified Restoration Dry Cleaning Network, LLC</u> <u>v. Tenke Corp.</u>, 511 F.3d 535, 541 (6th Cir. 2007) ("[W]e apply our own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction. . . .").

   Nevada law entitles a litigant to seek a preliminary injunction in the following circumstances.

   1. When it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually.

   2. When it shall appear by the complaint or affidavit that the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the plaintiff.

   3. When it shall appear, during the litigation, that the defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

NRS 33.010.

   Travelers claims that it is entitled to a freeze of the Peek defendants' assets based on their fraudulent acts to convert and hide assets from Travelers through the pendency of the litigation. While there may be a question whether a party is entitled to a preliminary injunction pursuant to NRS 33.010(1) under its claim of <u>quia timet</u>, <u>see</u> <u>Hudson Insurance Co. v. Simmons Constr.</u>, LLC, No. CV-12-407-PHX-GMS, 2012 WL 869383, at 4 (D. Ariz. March 14, 2012) (finding no authority in Ninth Circuit for preliminary injunctive relief for collateralization); <u>Hanover Ins. Co.</u>

4

1   <u>v. TLC Investing, LLC</u>, No. CV-12-407-PHX-GMS, 2011 WL 3841299, at *1 (D. Nev. Aug. 26,

2   2011) (denying motion for reconsideration of denial of preliminary injunction because authority

3   supporting classifying harm suffered by a surety as irreparable was not binding on the court),

4   Travelers' requested preliminary injunctive relief to protect assets from dissipation or concealment

5   would fall squarely under NRS 33.101(2) and (3) as "[w]hen . . . the continuance of some act,

6   during the litigation, would produce great or irreparable injury to the plaintiff," or "[w]hen . . . the

7   defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act

8   in violation of the plaintiff's rights respecting the subject of the action, and tending to render the

9   judgment ineffectual."

10          Turning to whether an injunction should be granted pursuant to federal law, there is ample

11   law in the Ninth Circuit recognizing the court's authority to issue a preliminary injunction freezing

12   assets.  <u>See In re Estate of Ferdinand Marcos</u>, 25 F.3d 1467, 1480 (9th Cir. 1994) ("[A] district

13   court has authority to issue a preliminary injunction where the plaintiffs can establish that money

14   damages will be an inadequate remedy due to impending insolvency of the defendant or that

15   defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment"); <u>Arch Ins.</u>

16   <u>Co. v. Sierra Equip. Rental, Inc.</u>, No. CIV S-12-0617 KJM KJN, 2012 WL 5897327, *4 (E.D. Cal.

17   Nov. 13, 2012) (court has authority to grant a preliminary injunction freezing defendants' assets

18   based on sureties' claims of asset concealment and dissipation); <u>Red Head, Inc. v. Fresno Rock</u>

19   <u>Taco</u>, LLC, No. C-08-5703 EMC, 2009 WL 37829, at *4-5 (N.D. Cal. Jan. 5, 2009) (granting

20   asset freeze injunction when evidence showed that defendant had made loans to affiliated entities

21   and individual); <u>see also</u> <u>Hendricks v. Bank of America, N.A.</u>, 408 F.3d 1127, 1141 (9th Cir.

22   2005) (recognizing that it was a matter of the district court's discretion to determine whether

23   preliminary injunction was warranted to prevent insolvency).

24          Generally, a court may not issue a preliminary injunction freezing a party's assets unless

25   the party seeking the injunction has stated a cause of action for equitable relief.  <u>See In re Focus</u>

26

5

1   Media, Inc., 387 F.3d 1077, 1084-85 (9th Cir. 2004).  Applying that proposition, the court in Arch

2   Insurance Co., found causes of action for equitable relief rested in plaintiff's claims for promissory

3   estoppel, a request for specific performance, and injunctive relief, and noted that plaintiff had

4   specifically requested injunctive relief in its complaint.  2012 WL 5897327, at *4.  Here, as in

5   Arch, Travelers seeks in its complaint equitable relief in the form of specific performance

6   regarding the collateral to be posted pursuant to the GAIs, specific performance regarding the

7   production of books and records pursuant to the GAIs, and quia timet injunctive relief preventing

8   defendants from transferring assets without a court order.

9   A.   Secreting or dissipating  assets

10         In its motion for preliminary injunction for an asset freeze, Travelers has documented a

11  number of actions taken by the Peek defendants which establish a pattern of dissipation or

12  concealment of assets.  Michael Peek submitted his own declaration and that of Mark Gubler in

13  opposition to Travelers' motion for the injunctive relief (#236).[3]  Peek's declaration includes an

14  exhibit consisting of a personally-prepared line-by-line rebuttal of Travelers' points and authorities

15  and accompanying declarations.  The exhibit contains, for the most part, Peek's denials of what

16  Travelers claims the evidence shows and, at times, his alternative explanations for events.

17  However, except with regard to the limited points made in the Gubler declaration, Peek's

18  declaration contains no independent evidence in support of his statements.

19         Morever, while present at the preliminary injunction hearing, Peek was not called by his

20  counsel to testify as to the matters addressed in his declaration, which, of course, would have

21  subjected him to cross-examination.  Nor did Peek's counsel refer to Peek's declaration at all to

22  support the arguments in opposition to the preliminary injunction or, for that matter, present any

23

24         [3]At they time they filed their opposition, the Peeks represented themselves, but readily admit
    to "prevail[ing] upon a family friend who is licenced to practice law to assist in preparing the points
25  and authorities and opposition . . .".  Suffice it to say that such ghostwriting not only raises issues of
    professionalism, but could, in fact, prejudice a case by failing to assure that the legal assistance
26  provided is accompanied by the ethical duties and responsibilities an attorney has to a client.

additional evidence at the hearing, although it made such a request in its previously filed supplemental materials.  To the extent that counsel for the Peek defendants seeks opportunities for future evidentiary hearings to present additional evidence, the court denies such a request as untimely and unsupported by good cause for further continuing the injunction hearing.

Finally, the court takes into account that all of Michael Peek's responses were made under his conviction that, in the words of his own declaration, "Travelers has commenced a vendetta to drive myself and my family into the ground, and leave us bankrupt and destitute."  There is absolutely no evidence that such is the case, and the objective value of Peek's written assertions suffers as a result.  While the court will refer at times in its discussion of the evidence to points made in Peek's declaration, in general, the court finds that it is for the most part conclusory, lacks evidentiary import, relies to a large degree on hearsay, and is untested for credibility, bias, and self-interest.

(1)     The Peek defendants' concealment of indemnitor bank accounts in violation of the court's February 17, 2012, order to disclose all bank accounts

After producing statements for four accounts for Peek Construction and Williams Brother following the court's order, Travelers discovered through documents produced by a different entity, Richie Brothers, that Peek Construction had opened undisclosed bank accounts on November 28, 2011, at Independence Bank in California, and on November 4, 2011, at Service 1st Bank in Nevada, just days after Travelers made a collateral demand on defendants on October 25, 2011.  During November 2011, $1.35 million was deposited into the undisclosed Service 1st Bank account.  Those funds were then removed, including a $949,000 transfer to CSC Holdings, LLC. The Peeks transferred $857,000 into the Independence Bank account in December 2011, and $400,000 into the account in January 2012.  Those funds were removed by transfers to other accounts.

7

1    In his declaration, Peek simply denies any concealment of bank accounts, and asserts that

2    evidence will be presented by Edeane Lawson to support that records of the accounts were made

3    available to Travelers.  Peek provided no such evidence at the hearing.

4         (2)    The Peek defendants' conversion and attempts to convert proceeds of sales of

5                   equipment subject to Travelers' perfected security interest

6         In January 2012, Travelers filed a motion for preliminary injunction indicating that Peek

7    Construction and Williams Brother had begun the process of liquidating through auction of their

8    equipment, upon which Travelers asserted a perfected security interest.   Peek Construction and

9    Williams Brother requested that the court grant them permission to use the proceeds of the sales of

10   equipment in order to continue to finance their businesses despite Travelers' claimed interest.  The

11   court, however, determined to allow Peek Construction and Williams Brother the use of such

12   proceeds only to the extent that Peek Construction and Williams Brother posted security to

13   Travelers.  The defendants were unable or unwilling to post the security.

14        Travelers supplies evidence, however, that the Peeks attempted to conceal and dissipate the

15   assets, nonetheless.  According to declarations submitted by Travelers, settling defendants Michael

16   and Ashley Williams (the "Williams brothers") disclosed that Michael Peek requested them to

17   shelter assets from Travelers by having these assets transferred into previously-formed Williams

18   family trusts.  In fact, according to the Williams brothers, Michael Peek delivered Williams

19   Brother equipment to auction for sale under the names of the Williams brothers' family trusts so

20   that the proceeds of those sales could be hidden from Travelers; but the Williams brothers instead

21   agreed with Travelers to turn over any such auction proceeds.  Even though the Peeks did not

22   succeed in converting auction proceeds using the Williams family trusts, Travelers identifies how

23   they were successful in converting to their own use $33,550 in proceeds from the auction of

24   equipment that had been transferred to the Gubler defendant family trusts.

25

26

In his declaration, Michael Peek asserts that the record will show that Peek Construction and Williams Brother had been selling equipment for months to satisfy debts and pay expenses on projects. This admission, however, does not contest the attempt to conceal those sales by transferring the equipment through the Williams and Gubler family trusts. More importantly, Peek does not specifically dispute Michael and Ashley Williams' disclosures regarding the Peeks' intentions. As for Mark Gubler's declaration, he admits to selling equipment that he, on behalf of his family trust, had acquired. He provides no documentation, however, of the ownership of the equipment he claims was owned by the trust, and does not address the Williams' claims that Peek solicited them to use their family trust to shelter assets from Travelers. Gubler did not testify at the injunction hearing.

       (3)     <u>Transfers from the undisclosed bank accounts</u>

On December 30, 2011, less than two weeks before Travelers filed its impending action, two corporations were formed by relatives of Michael Peek: Tanner, LLC ("Tanner") and Gibbs Trucking, LLC ("Gibbs Trucking"). Tanner was formed under the management of CP Enterprises, LLC ("CP Enterprises"), whose managers were Brenda Peek, Michael Peek's wife, and Leslie Jay, Michael Peek's daughter and secretary of Peek Construction. Gibbs Trucking was formed under the management of Tanner.

Records from Independence Bank indicate that Peek Construction, which as previously discussed had opened an undisclosed account at Independence Bank, had made transfers of money from its account to Tanner and Gibbs Trucking, undisclosed until Travelers subpoenaed Independence Bank's records. Michael Peek also opened accounts at Independence Bank for Tanner and Gibbs Trucking. The bank's records indicate that Gibbs Trucking received a wire transfer of just over $94,000 from the equipment auction company, Richie Brothers, who produced an auction settlement statement for an auction held on January 27, 2012, of equipment allegedly owned by Gibbs Trucking. The contract for the auction was signed by Robert Jay (Michael Peek's

9

1   son-in-law) six days after Gibbs Trucking was formed.  The phone numbers for Peek Construction

2   and Williams Brother were listed as contact information for Gibbs Trucking on the auction

3   contract.

4         Robert Jay signed the auction contract on behalf of Gibbs Trucking to sell the collateral in

5   question.  He testified in deposition, however, that he had no idea how his name became

6   associated with Gibbs Trucking and had never met or spoken to the attorney who formed Gibbs

7   Trucking during its incorporation up through the time of the sale of the collateral.  Jay further

8   testified that he had no idea his wife, Leslie Jay, was listed as Gibbs Trucking's manager through

9   CP Enterprises and Tanner.

10         Leslie Jay testified at her deposition that she had never been affiliated with Gibbs Trucking

11   even though she was listed, along with Brenda Peek as the manager of CP Enterprises, which

12   managed Tanner, which in turn managed Gibbs Trucking.  Leslie Jay testified that her father,

13   Michael Peek, had set up Gibbs Trucking, but she did not know for what purpose, and she had no

14   knowledge of the $94,000 deposit.

15         Independence Bank records also reveal that Gibbs Trucking made two transfers out of its

16   account to the Monex Deposit Company, a gold dealer.  The first transfer was made on February

17   24, 2012, for $57,000 and the second on March 2, 2012, for $50,000.  Three days later, on March

18   5, 2012, Gibbs Trucking purchased sixty gold coins from Monex, which were delivered to Leslie

19   Jay and Brenda Peek.  Gibbs Trucking closed its checking account one month later, and less than

20   four months after its formation.

21         In October 2012, Michael Peek appeared on behalf of Gibbs Trucking at its Rule 30(b)(6)

22   deposition, and testified that in September 2012, Gibbs Trucking had sold sixty gold coins for

23   $99,000 cash using Craigslist.  Gibbs Trucking supposedly used the cash from the sale to repay a

24   loan from Bays, LLC ("Bays"), whose sole manager is Brenda Peek.  In her deposition, Brenda

25   Peek testified that she was not aware that she held that position, and had never heard of CP

26

1   Enterprises (which managed Gibbs Trucking through Tanner), even though her signature appears

2   on the note documenting the alleged $94,000 loan from Bays to Gibbs, signing for both entities.

3          It is notable that when Michael Peek appeared on behalf of Bays at its Rule 30(b)(6)

4   deposition, he could not recall how or if Gibbs Trucking repaid the claimed Bays loan, even

5   though he had previously testified on behalf of Gibbs Trucking that the loan had been paid to Bays

6   in cash.  Nor could Michael Peek explain why the transaction did not show up on Bays' bank

7   statements.

8          With respect to the Bays loan, Leslie Jay, the manager of Tanner, which in turn managed

9   Gibbs Trucking, did not know why Bays would loan money to Gibbs trucking.  Nor did Ms. Jay

10  have knowledge regarding the transfer of the $107,000 to Monex, but admitted that her father

11  Michael Peek arranged for the purchase of the gold coins, apparently using either her or Brenda

12  Peek to arrange for the transfer as their names were the only ones authorized on the Gibbs

13  Trucking bank account.

14         Furthermore, Travelers points out that the promissory note produced by Michael Peek for

15  the Bays loan to Gibbs Trucking is dated February 13, 2012, over two weeks after Gibbs Trucking

16  had already made its only sale of equipment at auction on January 27, 2012.  Also, Bays' banking

17  records subpoenaed by Travelers do not show a deposit of $99,000, or even totaling $99,000

18  during the fall of 2012, suggesting that the Bays' alleged loan was never paid by Michael Peek.

19         In addition, the receipt produced by Gibbs Trucking indicated that the gold coins were sold

20  to a Thomas Lee for $99,000 on September 21, 2012.  While Gibbs Trucking produced a

21  Craigslist add showing the coins posted for sale, neither the company nor Michael Peek could

22  produce the address or phone number for Lee.

23         Finally, Travelers has alerted the court to information on a new bank account opened by

24  Michael Peek in April 2012 for Bays at a local Cache Valley Bank in Logan, Utah.  Days after

25  opening the account, Peek transferred $162,364 received from the sale of the La Madre offices of

26

1    Williams Brother and Peek Construction to Bays' Cache Valley Bank account.  Peek also closed

2    the two pre-existing Bays accounts at Nevada State Bank and Independence Bank, transferring

3    those balances to Bays' Cache Valley account.  On May 24, 2012, Michael Peek wrote a check

4    from Bays' Cache Valley Bank account for $150,000 to a Texas limited liability company, H-

5    Town Holdings, LLC ("H-Town"), which had been formed just days earlier by Stanley Paul

6    Trimm.  Peek also transferred $50,000 to H-Town by wire transfer to H-Town's bank, 1st National

7    Bank of Hughes Springs in Hughes Springs, Texas.  Travelers subpoenaed Trimm for H-Town's

8    bank records, but he delayed in producing the requested documents.  From records produced by

9    Hughes Springs Bank, Travelers discovered that H-Town's account had been accessed regularly

10   by the Peeks since its formation.  Travelers also learned from 1st National Bank of Hughes

11   Springs that six days after a subpoena had been issued to Trimm regarding H-Town's records, but

12   before Trimm produced the records, Brenda Peek transferred $90,000 out of the H-Town account

13   to a newly created personal checking account at Wells Fargo Bank in Las Vegas.  Brenda Peek

14   then withdrew some $74,000 in cash increments from the Wells Fargo account over the course of

15   the next month, leaving the funds untraceable.

16           Michael Peek does not respond to these points except with conclusory statements about the

17   operations of the subject entities, their managers, and the loans involved, all of which are devoid

18   of evidence or testimony supporting them.  In particular, with respect to the gold coin transactions,

19   Peek simply states that they were justified as investments, with no further explanation or evidence.

20   Peek does not sufficiently address the involvement of H-Town.  Nor is there adequate explanation

21   by Peek of the timing of the opening and closing of accounts, numerous transfers of funds and, in

22   many cases, their ultimate disposition.

23           (4)     Dissipation of tax refund

24           On January 28, 2013, Travelers filed an application for an order to show cause and motion

25   for an order segregating and sequestering collateral in the form of a tax refund that they were to

26

12

receive for their 2011 taxes.  The magistrate judge scheduled a hearing on February 22, 2013, which the Peeks failed to attend.  Travelers has shown that only days before the hearing, on February 20, 2013, the Peeks received the 2011 tax refund in the amount of $37,202.85, and would have expected to be questioned about it at the February 22, 2013, hearing.  Knowing that a ruling on the disposition of the tax refund was pending before the court, the Peeks deposited the check and withdrew the funds in cash in three separate withdrawals within 8 days of the deposit. On February 28, 2013, this court, not having been informed of the receipt of the refund, its deposit, and its dissipation, entered a temporary restraining order enjoining the spending or transfer of the funds pending a determination of Travelers' application for their sequester. Travelers has been unable to discover what happened to these funds.

In his declaration, Michael Peek asserts that he has not violated court orders regarding the tax refund and the equipment auction because no court orders were in place at the time these actions were taken.  The question, however, is not whether the Peek defendants violated court orders–that would be a subject of contempt proceedings.  What is at issue is whether the Peeks, having knowledge of the court's intention to consider the disposition of the refund and equipment, intentionally acted to dispose of those assets before such a determination could be reached by the court.  Given Peek's attitude about beating the court to the punch, so to speak, the court finds that the Peeks intentionally acted to alienate assets before pending judicial determinations regarding their disposition could take place--which factors into the court's analysis of whether the Peeks have engaged in a pattern of concealing or dissipating assets, and whether they may do so again.

(5)     Loss and lack of accounting for financial records

Travelers submits deposition testimony of Barry Bulow, Peek Construction and Williams Brother former financial controller, and Dina Gattuso, a former employee in Peek Construction accounting department, to establish that Peek Construction ran a project known as Lake Las Vegas Outfall Repair without entering the project into Peek Construction's accounting system, and

billing expenses and employees to different projects.  And, after Travelers filed a motion for

contempt against Williams Brother and Peek Construction for failing, in violation of court order,

to provide all computer servers known to have been utilized for business data, the companies

advised Travelers that they had discarded a server which they alleged to have been not

functioning.  This server happened to be one which included business documents and voluminous

spreadsheets recording cash transactions between the companies, asset protection documents

detailing the inter-relationship of Peek-owned shell companies, which were recovered by

Travelers from third parties.  None of the principals or managers related to Peek Construction

could provide information about the spreadsheets and organizational charts.

Regarding the Lake Las Vegas Outfall Repair, Michael Peek asserts in his declaration that

the project, in fact, is reflected in accounting records; however he provides no such records in

support.  Morever, Peek simply dismisses Bulow's testimony as incorrect because he would not

have entered the project into the system; Edeane Lawson, would have.  There is no evidence from

Edeane Lawson in the record to substantiate Peek's statement.

As to the lost computer server, Peek explains in his declaration that the computer crashed

and was irreparable before Travelers asked for it, and rejects the idea that the cash transfer

spreadsheet and organizational chart came from the lost computer.  Rather, Peek maintains that the

documents must have come from a locked office and hacked from a password protected computer.

Peek does not explain, however, why the secured documents would not have been otherwise

produced to Travelers, or how he would have knowledge of their existence.

Given the above showing by Travelers, and the lack of evidence presented by the Peek

defendants, the court has little hesitancy in finding that Travelers has sufficiently supported a

pattern by the Peek defendants of transferring collateral and concealing or dissipating proceeds, or

attempting to do so.  This finding takes into particular account the uncontested statements by the

Williams brothers regarding the Peeks' attempts to shelter assets, the Peeks' nondisclosure of all

14

1   bank accounts in violation of the court's February 17, 2012, order, and the Peeks' intentional

2   circumvention of the court's imminent disposition of equipment and the 2011 tax refund.

3   B.     Likelihood of success on the merits

4          Travelers' likelihood of success on the merits is high.  Defendants agreed under the GAIs

5   to fully indemnify Travelers for the entire amount of Travelers' losses on the bonds issued to Peek

6   Construction and Williams Brother.  "[T]he purpose of the GIA is to hold the surety harmless for

7   all expenses." Transamerica Premier Ins. Co. v. Nelson, 110 Nev. 951, 956, 878 P.2d 314, 317

8   (Nev. 1994).  The Nelson court explains that "in the case of a surety sued on a bond, the surety

9   generally has no culpability whatsoever, and the entirety of its obligation arises from its

10  undertaking on behalf of the indemnitor and principal obligor.  Therefore, the GIA entitles the

11  surety to full recovery . . .".  Id. at 956, 878 P.2d at 317; see also Insurance Co. of the West v.

12  Gibson Tile Co., Inc., 122 Nev. 455, 134 P.3d 698 (Nev. 2006) (surety has the right to pursue its

13  indemnification claims under the plain terms of a general indemnity agreement).

14         Here, Travelers has submitted evidence that it has paid bond claims and incurred costs and

15  attorneys' fees on the Peek Construction and Williams Brother bonds that total over $14.6 million

16  in net losses to Travelers.  Section 7 of the GAIs specifies that the indemnitors' obligation to

17  exonerate and indemnify Travelers for all losses is joint and several.  Section 12 of the GAIs

18  provides Travelers with a broad security interest in the indemnitors' assets:

19         As security for their obligations hereunder, Indemnitors hereby grant to [Travelers] a
           security interest in the following properties, assets and rights of Indemnitors, wherever
20         located, whether now owned or hereafter acquired or arising, and all proceeds and products
           thereof: all goods (including inventory, equipment and any accessions thereto), instruments
21         (including promissory notes), documents, accounts, chattel paper, deposit accounts, letter-
           of-credit rights, securities and all other investment property, supporting obligations, any
22         Contract or contract rights or rights to be the payment of money, insurance claims and
           proceeds, and all general intangibles (the "Collateral").
23
           Travelers perfected its security interest in the collateral by filing a UCC-1 financing
24
    statement with the Nevada Secretary of State as to Peek Construction and Williams Brother.
25
    Thus, under the provisions of the GAIs, each of the Peek defendants jointly and severally not only
26

15

owes Travelers the amount of its current net losses of $14.6 million dollars, but each of the

defendants has granted Travelers a broad security interest in all their assets to secure Travelers'

right to be indemnified and exonerated.

In their opposition to the motion for preliminary injunction, the Peek defendants do not

dispute that they are obligated to indemnify and exonerate Travelers pursuant to the GAIs.  Rather,

they challenge Travelers' evidence as speculative and self-serving statements of counsel.  The

court finds that Travelers' evidence of its losses is probative and competent, even without

reference to the agreement of the parties in Section 12 of the GAIs that any "evidence of payment

shall be prima facie evidence of the propriety, amount and existence of the Indemnitors' liability."

In several unrelated contexts, the Peeks' latest counsel has argued the existence of

meritorious defenses.  The Peek defendants assert that, despite defendants' protests, Travelers paid

subcontractors and suppliers on invalid claims, paid certain subs for incomplete, defective work,

or overbilled work.  The Peek defendants have also asserted that Travelers failed to reasonably

investigate the claims that it settled, citing U.S. for Use of Trs. of Elec. Workers Local Pension

Fund v. D. Bar D. Enters., Inc., 772 F. Supp. 1167 (D. Nev. 1991).  However, section 4 of the GAI

executed by the parties in this case provides:

> [Travelers] shall have the right, in its sole discretion, to determine for itself and
> Indemnitors whether any claim, demand or suit brought against [Travelers] or any
> indemnitor in connection with or relating to any Bond shall be paid, compromised, settled,
> tried, defended or appealed, and its determination shall be final, binding and conclusive
> upon the Indemnitors. [Travelers] shall be entitled to immediate reimbursement for any
> and all Loss incurred under the belief that it was necessary or expedient to make such
> payments.

Defendants argue that this provision is subject to the limitation that where an

indemnification agreement subjects the right to settle a claim to the sole discretion of the surety,

the parties may expect that the surety will settle only after reasonable investigation of the claims,

and possible defenses.  See U.S. for Use of Trs. Of Elec. Workers Local Pension Fund v. D Bar D

Enters., Inc., 772 F. Supp. at 1170 (citing City of Portland v. G.D. Ward & Assoc., 89 Or. App.

16

452, 457, 750 P.2d 171, 175 (Or. App. 1988)).   Assuming that this standard reflects Nevada law, D Bar D Enters. further instructs that "'where a written indemnification agreement exists, however, the indemnitee need show only potential liability,' id. (citing Hawaiian Ins. and Guar. Co. v. Higashi, 4 Haw. App. 608, 672 P.2d 556, 558 (Haw. App. 1983), rev'd on other grounds, 67 Haw. 12, 675 P.2d 767 (Haw. 1984))," and that "[a] court confronted with such an agreement should insure that the claim was not frivolous, that the settlement was reasonable, that it was untainted by fraud or collusion, and that the indemnitee settled under a reasonable apprehension of liability." Id. (citing Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1218 (5th Cir. 1986)). Moreover, as defendants' only citation to Nevada authority points out, "if an indemnity agreement provides that evidence of payment is prima facie evidence of an indemnitor's liability, the burden is on the indemnitor to show that the action of the surety, in satisfying its obligations, was not reasonable, or was in bad faith."  See Transamerica Premier Ins. Co. v. Nelson, 110 Nev. 951, 957, 878 P.2d 314, 318 (Nev. 1994) (citing D Bar D Enters., 772 F. Supp. at 1173).  Defendants present no reason why the same burden would not be placed on indemnitors in the presence of a "sole discretion" clause in the indemnitee agreement.  See Hawaiian Ins. & Guar. Co., Ltd. v. Higashi, 67 Haw. 12, 675 P.2d 767 (Haw. 1984) (general rule that indemnitee's burden to prove reasonableness shifts to indemnitor where provision in indemnitee agreement grants indemnitee legal right to settle claims) (reversing 4 Haw. App. 608, 672 P.2d 556 (Haw. App. 1983)).

Here, the indemnitor defendants have not met their burden by presenting evidence showing that Travelers did not apprehend potential liability regarding the claims in question, that the claim was frivolous, or that Travelers' actions were unreasonable or taken in bad faith.  Morever, even if the payment of the Better Building Systems' claim were called into question, as Travelers pointed out in the preliminary injunction hearing, it would only represent a very small fraction of the $14.7 million in losses claimed by Travelers.

The Peek defendants have also raised in other contexts Travelers' alleged breach of the implied covenant of good faith and fair dealing as a meritorious defense. The Peek defendants concede that they are not claiming a tortious breach; still, considering the lack of evidence in support of the claim of a contractual breach of the implied covenant of good faith and fair dealing, the court finds the defense to be weak.

Finally, the Peeks assert that the indemnity agreement is inapplicable to the indemnitor BLC Nevada Trust Dated April 20, 2006, because the pledge of assets constituted an economic benefit to the trustors, but not the trust, and therefore required the authorization of the distribution trustee. However, Michael Peek is listed as an investment trustee vested with the following powers pursuant to Article 13 of the trust agreement:

(e)     To borrow money, mortgage, pledge or lease trust assets . . .

. . .

(s)     Except as limited by Section 3.3 above [distributions to a Trustor], the powers enumerated in NRS 163.265 to 163.410 [including allowing trustees to make contracts, execute instruments, and guarantee loans]. . . are hereby incorporated herein to the extent they do not conflict with any other provisions of this instrument.

. . .

(y)     Borrow money for any Trust purpose upon such terms and conditions as may be determined by the Trustees, and to obligate the Trust estate for the repayment thereof; to encumber the Trust estate or any party thereof by mortgage, deed of trust, pledge or otherwise, for a term within or extending beyond the term of the trust.

In Section 18 of the GAI, Michael Peek and BLC confirmed to Travelers that Peek signed the GAI on behalf of the trust in full compliance with the terms of the trust agreement and that he had the authority to bind the trust. Accordingly, this claimed meritorious defense also lacks merit, and Travelers has shown a likelihood of success on the merits.

C.     Irreparable harm

Concealing or dissipating assets can constitute irreparable harm. See In re Estate of Ferdinand Marcos, 25 F.3d at 1480; In re Focus Media Inc., 387 F.3d at 1086-87. Travelers'

18

1    evidence, previously outlined, that the Peek defendants have secreted diverted assets, and the Peek

2    defendants' lack of evidence that those activities were legitimate, supports a finding that Travelers

3    has no adequate remedy at law and would suffer irreparable harm if an injunction does not issue.

4    D.    Balancing hardships and public interest

5        In the absence of evidence to the contrary, the danger that Travelers will not be able to

6    recover on its claims is greater than the harm the Peek defendants will suffer from a freeze of their

7    assets before trial.  The original temporary restraining order (#244) enjoins, for relevant purposes,

8    the Indemnitor defendants, which includes Michael Peek and Brenda Compton Peek, "by

9    themselves or through others . . . from selling, transferring, disposing of, or liening their assets and

10   property including the assets and property of all entities owned or controlled by Indemnitor

11   Defendants, or expending any funds until resolution of Travelers' Emergency Motion, with the

12   exception for expenditures for Court-approved living expenses."  The expanded temporary

13   restraining order (#281) added the corporate entities Peek Construction Company, Inc., ECCL

14   Holdings, LLC, and BLC Nevada Trust dated April 20, 2006, to the previously ordered relief.

15       The Peek defendants argued in part in their previously filed motion to void temporary

16   restraining order (#265) and at the preliminary injunction hearing that the previously granted

17   injunctive relief is overbroad and void because it reaches nonparty entities.  However, Fed. R. Civ.

18   P. 65(d)(2) provides that every order granting an injunction is binding not just on the parties to the

19   action, but also their officers, agents, servants, employees, and attorneys, and upon "other persons

20   who are in active concert or participation with" them.  Here, as the court has discussed above,

21   significant evidence exists that CP Enterprises, Bays, Gibbs Trucking, and H-Town, were used as

22   vehicles to transfer, conceal or dissipate assets which would be the subject of Travelers

23   collateralization and indemnity claims.   Moreover, in its response to the motion to void the

24   temporary restraining order and its preliminary injunction motion regarding the formation of,

25   control over and interactions between CP Enterprises, Bays, and Gibbs Trucking, Travelers makes

26

19

a strong showing for purposes of a preliminary injunction that these entities are alter egos of

Michael Peek.[4]

That being the case, the court also takes into account the Peek defendants' concern that

legitimate investment or business opportunities may be compromised if the third-party entities

over which the Peeks have control or an ownership interest remain frozen.  In that regard, the court

finds it judicious to permit the Peek defendants to request court approval for third-party use of

assets during the period in which the preliminary injunction is in place.

E.    Public interest

There is a public interest in the enforcement of contracts and judgments.  When an

injunction will impact non-parties and has the potential to impact the public, the public interest is

relevant.  See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139 (9th Cir. 2009).  However, "[w]hen

the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties,

the public interest will be "at most a neutral factor in the analysis rather than one that favor[s] in

[granting or] denying the preliminary injunction." Id. at 1138-39 (quoting Bernhardt v. L.A. Cnty,

---

[4]      In Nevada, the requirements for finding alter ego, which must be established by a
preponderance of the evidence, are

(1)    The corporation must be influenced and governed by the person asserted to be its alter
ego;

(2)    There must be such unity of interest and ownership that one is inseparable from the
other; and

(3)    The facts must be such that adherence to the fiction of separate entity would, under the
circumstances, sanction a fraud or promote injustice.

Polaris Industrial Corp. v. Kaplan, 103 Nev. 598, 601, 747 P.2d 884, 886 (Nev. 1987).

In determining whether a unity of interest exists between the individual and the corporation, courts
have looked to facts like co-mingling of funds, undercapitalization, unauthorized diversion of funds,
treatment of corporate assets as the individual's own, and failure to observe corporate formalities.  Id.
at 601, 747 P.2d at 887. These factors may indicate the existence of an alter ego relationship, but are
not conclusive.  There is no litmus test for determining when the corporate fiction should be
disregarded, the result depends on the circumstances of each case.  Id. at 601-602, 747 P.2d at 887.

339 F.3d 920, 931 (9th Cir. 2003)).  Here, the court determines that, under the circumstances presented, and in light of defendants' ability to seek court approval for certain asset-related dealings of non-party entities which are affected by the relief, the reach of the injunction is narrow and limited enough that the public interest is not implicated in a significant way.

F.    Bond

    While the court is not convinced that a bond is necessary in view of the strength of Travelers' position, the court finds that, given that an asset freeze is an extraordinary remedy, and that the injunctive relief reaches entities which have been shown to be in participation and concert in defendants' actions, the bond amount should be raised from $10 to $10,000.

Conclusion

    Based on the foregoing,

    THE COURT HEREBY ORDERS that Travelers Casualty and Surety Company of America's emergency motion for injunctive relief freezing all assets of indemnitor defendants (#225) is GRANTED as set forth herein.

    THE COURT FURTHER ORDERS that, within ten (10) days from the filing of this order, Travelers shall file a proposed preliminary injunction freezing all assets of indemnitor defendants as set forth herein.

    THE COURT FURTHER ORDERS that Travelers' motion for partial summary judgment of specific performance of the collateral security clause (#122), which was administratively denied pending the court's determination of the preliminary injunction freezing assets shall be REINSTATED as of the date of the entry of the preliminary injunction.

    THE COURT FURTHER ORDERS that, as defendants were represented by counsel during the briefing of Travelers' motion for partial summary judgment of specific performance of

/ / /

/ / /

21

the collateral security clause (#122), the indemnitor defendants' request made during the
preliminary injunction hearing to file supplemental briefing is DENIED.

DATED this _____ day of October, 2013.

 

 

 

 

_____
Lloyd D. George
United States District Judge

22